Good morning. May it please the court, Becky Walker-James for the appellant Israel Carrillo-Leal. Also present is attorney Joel Levine, appearing for appellant Stewart Jones. We've agreed that I will handle the opening argument and Mr. Levine will handle the rebuttal, and we'd like to reserve approximately three minutes for the rebuttal. All right. So watch your clock. You know it counts down. Okay. The issue here is whether the entry and search of the boat in question was subject to the emergency exception to the Fourth Amendment warrant requirement. It's undisputed there was no warrant here, and by the officer's own admission, there was no probable cause. So unless the emergency exception applies, this is an illegal search. The courts have made clear that the emergency exception applies where there's an imminent threat of bodily injury or death, and that just is not the case here. Here the officer saw a boat that appeared to be taking on water, which was not an uncommon occurrence, but there was not evidence of any injuries or a threat of injury, and I think... Let me stop here and ask about the threat of injury. First of all, the record is undisputed in some respects, right, because you have affidavits that were filed, no cross-examination. The judge relied on the affidavits. So then what review do we have here? Isn't it abuse of discretion based upon the facts? No, Your Honor, I would say that the review is de novo. It's for the motion to suppress the facts are undisputed, and the only question is whether those facts justify the search under the emergency exception. But with respect to the facts, you're not going to argue that the facts that are different than what was set forth in the record by way of affidavit, right? Right. Okay. And I think actually I would like to point to some of the facts that are interesting to show the objective unreasonableness of the invocation of the emergency exception here. And I think in particular, if we look at the declaration of Raymond Lorenzo Bata, who was the other officer, one of the other officers on the boat. Deputy Martin is the officer who entered the boat. But tellingly, it's interesting to look at the perspective of the officer who remained on the fire boat during this whole search and entry. And he observed, and this is at the Jones Excerpt of Record page 33. Which declaration? This is declaration of Deputy Bata, the OTTA, and it's at the Jones Excerpt at page 33, the reference I'm referring to. And what he notes there is that at the conclusion of Deputy Martin's search of the boat, when he backed up, by this time he had seen the aliens and he backed up and was calling for emergency backup. Deputy Bata noted, at first, I did not know what the emergency was and was a little confused about why Deputy Martin had made the request. Because at the time, my only consideration was that we were there to assist a boat taking on water. So by this deputy's own observation, he didn't know what the emergency was. And so he did not understand, and a reasonable person observing these events would not have considered this to be an emergency. And also, the boats taking on water, there's a testimony that that was a pretty common occurrence. In fact, these deputies were often called to assist. Is that in the record? Yes, in the declaration of William Nelson, the other deputy who was on the fireboat at the time. And he says it's a common occurrence? It's a common occurrence, sometimes as often as twice a day. And that was at Jones Excerpt of record, page 27. So these officers, the government's own evidence shows, supports that this was not an emergency. This was a commonplace occurrence of a boat taking on water, and it did not justify the warrantless search of the boat. But if it's a common occurrence, it's a common occurrence where the boat could, in fact, sink, right? And that's why they moved as they did. There is testimony that boats can sink in those circumstances, but there was no evidence that that was going to happen imminently. Well, wasn't the boat traveling in circles? Right. And what Deputy Martin actually described was that the boat was maneuvering in circles, in a circle. So that indicates actually it was being driven in a circle, not necessarily circling down the drain. I mean, there's no evidence that this boat was in imminent distress at that time. So the boat's traveling in circles. Isn't that evidence of distress? Well, maybe evidence of... Maybe it is, isn't it? I'm sorry, I didn't catch the last part. I tell you, if it's traveling in circles, is it not in distress? Well, I think it could be certainly a sign that there was something... It could be. It's a pretty good sign. I'm sorry, I did not hear the last part. Yeah, you say it could be. You know, people have got to make judgments on the basis of what's likely, and it seems to me likely. Going around and around, there's something wrong with it. Well, Your Honor, I think it was an indication that there was some problem with the boat. I mean, that I think they did know. I just want to explore this one question with you before your time is up. The David Martin declaration, he seemed to... At first, as Judge Newton pointed out, it seems that there was an emergency because the boat was maneuvering in a circle, riding very heavy in the bow, tilting forward an angle of approximately 10 to 15 degrees, and then they started seeing smoke. And that seemed to justify the initial entry onto the boat. But when he got on the boat, he looked to see if the boat was taking on water, and it wasn't. And they said they were okay, the engines were just overheating, but he commented that neither Carrillo, Leal, or Jones assisted him. Then he seems to change the basis for his search. In paragraph 13, he says, Seeing as how neither Carrillo, Leal, nor Jones made any effort to help lift the boat's hatches, I continued into my investigation into why the McYacht was riding so low in the water by opening the hatches in the cockpit myself. Now, what does that have to do with an emergency? I mean, the way I see it, the purpose, he's no longer using an emergency as justification for the further search. And I think we have case law that says that you can conduct a warrantless search in an emergency in order to further the purpose of the search. And the way I read this, and this is a question for the government as well, it seems as though the purpose of the search changed mid-search. I think that's exactly right, Your Honor. Even if it was justified to enter the boat in the first place, it clearly wasn't justified under the emergency exception. Once he started investigating and saw that there was not a fire burning, there was no injury, they were not in distress, and there was no obvious problem with the boat water gushing in, so it was going to go down immediately. And I think tellingly that the officer is then just opening up hatches, trying to find out the cause of the boat taking on water, that's not an emergency. Tellingly, he did not try to get these people off the boat. If he was really concerned about safety of people, he would have been telling them, put on your life vest, get off the boat, but he didn't do that. And I think that's exactly right. He was looking for the cause. He may have been curious, maybe he even had good intentions, but that's not an emergency. And I'd like to reserve the remaining time. Thank you. Good morning. May it please the Court, Anthony Brown for the United States. Your Honor, Deputy Martin's justification for being on the boat never changed. It's very clear from his affidavit that a smoking engine can be caused by a burst cooling hose that goes to the engine. His concern was twofold. The boat might be taking on water from such a burst engine, which would also cause the engine to smoke. And if Your Honors can look to paragraph 13 of his affidavit on page 20, he clearly explains his reason for looking in the cockpit hatch first. He says, I opened these hatches first because I was looking for the quickest, most convenient place to access the boat's bilge with our fireboat's pump hose. His affidavit also states, which is corroborated by the other deputies, that before going onto the boat, he ordered Deputy Bada to ready the hose so that he could immediately put it into the bilge when he found water. He also says here in paragraph 13, Furthermore, I know from training and experience that cockpit hatches often give access to the boat's inboard engines. And this is the important part. I therefore believe that opening the boat's cockpit hatches might also allow me to investigate the source of the smoke that had been emanating from the cockpit. Right, but when he did that, he found very little water. So if there wasn't water making the boat ride low, I'm wondering whether the focus of the search turned to something else was making the boat ride low, which could be alien smuggling. That's not what the record supports, Your Honor. I don't know. He doesn't talk about the emergency in paragraph 13. No, but in the immediate paragraph afterwards, he does. Deputy Bada is standing there perched over the hatch. He sees no water. He's surprised by that fact, granted, but his immediate assumption, because the boat is still listing under him. It's still tilting it 15 degrees forward into the water, riding low in the bow. He says to himself, The water must have gone into the bow. I don't think that's the best response because I've mulled this over. I think your best argument is that it remained an emergency search and not a criminal investigation. Because had he suspected that Coriolis, Allen, Jones were engaged in criminal activity, he wouldn't have let them remain unsecured right behind him. And that was a very unsafe and precarious position to put himself and to be alone on the boat if he suspected criminal activity. Certainly there are numerous other circumstances that point to the fact that he continued to believe that it was an emergency. Was there anything in the record that we are to look at that challenges the expertise? Anything? Nothing at all, Your Honor. Because we have the affidavits. They set forth the basis of their expertise, correct? That's correct, Your Honor. And the basis upon which they made the opinions they did, right? That's right, Judge. So they were never cross-examined? They never were. Thank you. And that leads me to another point that I would like to address from the reply brief, which has to do with the standard of review here. Judge Silver, you had previously asked about what we do with the facts. In the reply brief, the defendants claim that expertise and experience has nothing to do with the objective evaluation that the court is supposed to conduct here. But that's completely wrong. For alleged Fourth Amendment violations, the court always applies a reasonableness standard, and it does so in the numerous contexts in which Fourth Amendment violations come up, probable cause, reasonable suspicion, apparent authority in third-party consent cases, and it should be the same in this case. I'll cite to the court two recent decisions from this circuit from last year, United States v. Valdez-Vega and United States v. Cotterman. Cotterman probably has the best statement. And Cotterman's in the reasonable suspicion context, but I think the same objective reasonableness standard applies in this context. There's no reason why the court shouldn't also apply the same standard that Cotterman announced. We review reasonable suspicion determinations de novo, as we do here, reviewing findings of historical fact for clear error and giving due weight to inferences drawn from those facts by resident judges and local law enforcement officials. Both of these, well, two of the deputies on board the boat had 35 years of experience between them. They had, during certain seasons of the year, saved two boats sometimes a day. They knew that boats frequently could sink within minutes, and when they saw a boat tilting 15 degrees in the water, both of these deputies came to the same conclusion, that boat was sinking. That's why Deputy Martin jumped on the boat, and that's why when the boat continued to list at 15 degrees, even though he found no water in the aft hatch, I'm sorry, in the rear hatch, he continued to look forward in the boat for water that he thought, as he states in paragraph 14 of his declaration, had probably moved to the front of the boat. Can you distinguish the Dehmer case? The Dehmer case is the case that's, I think it's D-E-E-M-E-R, that's relied substantially upon by the appellants. I'm not sure what fact the court would require me to distinguish from that case, given that the facts in this case clearly support Deputy Martin's reasonable conclusion that there probably could have been water in the front of the boat. So what you're saying, are you familiar with the Dehmer case or not? You know, Your Honor, the facts escape me right now. If you remind me, then I'll… That's all right. I won't answer my own question. All right. So let me ask you this. You know, the district court made a decision in one respect, is that they asked for the help of those that were on the boat to help them find out what the problem was. And I suppose that cuts both ways. And they didn't respond. So logically you can think that, gee, why weren't they responding? Did they not know what they were doing? Were they in distress? On the other hand, you could conclude that they knew what they were doing. They knew there wasn't a problem. They kept saying that there wasn't a problem. So what's your response to that? I have two responses. One is, that's just as a general matter, one of the many factors that the deputies had to take into consideration. It wasn't just because the defendants themselves were making the statements doesn't give it any more weight than any other factor. So my responses are this. First, the deputies saved, as they stated in their declarations, sometimes up to two boats a day for taking on water in the middle of Newport Harbor. It happens a lot. They are experts in this area. They know when a boat can sink and when it can't sink. The second factor, an important factor in this case, is that it wasn't as if the boat was just sitting at the dock somewhere. It's floating around in the middle of a federal channel in Newport Harbor. The danger wasn't posed just to those particular people, but to other people who were in the area as well. The deputies had an obligation to go out there and take care of the boat. I'm sorry, I didn't mean to interrupt you, but I just want to get to Judge Silver's point. I'll just read you the quote from Deamer that I think she may be asking you to distinguish. In Deamer, we held that there has to be a reasonable basis to associate the emergency with the area to be searched. That was what I was getting to earlier, because at some point, the search became rather extensive. I mean, he was looking into every part of the boat, and that's how he found the smuggled aliens. That is completely unsupported by the record. The search was very circumscribed to exactly the area where the deputy reasonably concluded that he might find water. The boat was broken up essentially into three parts. The cockpit is outside of the boat, and it's the rear part of the boat. That was the first place that Deputy Martin went for the reasons that I just described. So where was it tilting? It was tilting so that the front of the boat was in the water, and the back of the boat, which is also clearly described in Deputy Martin's affidavit, was up out of the water, and that's where the engines would be located. He jumped onto the back of the boat because he wanted to kill two birds with one stone, check the engines, see if there was any water in the back hatch. He looked in the back hatch. He didn't see any water, scratched his head, and said, I know from experience that there are hatches all throughout the boat as you move forward through it. I'm going to go to the next one. The next one happened to be in the cabin. Now, the cabin was not where the aliens were located. The aliens were located even further into the boat in the galley. Deputy Martin went into the cabin. He didn't look around. He didn't search anywhere else. He opened a hatch. He looked in and found no water. At that point, he looked up, thought maybe I should go further into the boat, didn't take a step further in the boat, but from that vantage point saw the arm that was hiding behind the galley wall. So the search was very circumscribed to precisely the areas where he thought he was going to find the source of the emergency, which was the water in the boat. He didn't go into the galley. At that point, he drew his weapon and backed out. So to the extent that that addresses the court's question, I think that clearly the second part of the test for whether an exigency existed and whether the search was reasonable is met here. Deputy Martin did not do a full-scale search of the boat looking for anything else except for what he thought was causing the emergency in this case. Yes, he was wrong because there were 14 bodies shoved up there in front of the boat, but he didn't know that at the time. He thought it was water. All right. Your time's up. Thank you very much. Thank you. Thank you. I'll just address two points. First, it is noted in both our opening brief and our reply brief that this so-called emergency ceased to exist, as Mr. Brown just mentioned to you, when the aliens were discovered. Obviously the water issue, for lack of a better term, evaporated, and there was no further search looking for water. So this so-called emergency didn't exist. The other thing is I'd like to draw upon a question that Judge Silver raised during my colleague's argument, or maybe it was later, that had to do with the not cross-examining the officers and whether their expertise has to be accepted. I think we cited to the court, I know we did, in our reply brief, and I believe also in the opening brief, the U.S. Supreme Court case in Brigham City, which said that in searches such as this, an emergency exception, we don't look to the expertise and the subjective conclusions of the officer.  And we tend, I think, when we analyze these issues, to slide into the analysis that I'm on. I hope the court understands my comment here, that I think we all do this, and that is we do start to look at the subjective conclusions of an officer. Did he have the necessary background to make this kind of conclusion that he made? Well, and that's – I agree with you on that point, but why wouldn't we? based upon his expertise, based upon his experience. So we look at a determination, or we make the determination, as to whether or not the opinions are reliable based upon his experience. And that's all we have. So you're not – I take it, to start off with, you're not challenging, which was my question, you're not challenging the expertise of these officers. Am I right? I'm not challenging because I don't think it's relevant. Well, then any of the conclusions based upon their experience are not relevant? No. They're relevant to an objective analysis that is now being conducted. And we suggested in the reply brief that this is similar to having a camera on the scene, looking at what the officer was looking at. But a camera doesn't have experience. And the opinions in the affidavits are based upon experience, not an inanimate object that has had no experience. So I agree with you that, frankly, the Supreme Court has said the subjective state of mind of the officers are not relevant. Even if they were there for the purpose of criminal proceedings, the issue is whether or not their expertise, what they did, and what they concluded is objective, is objectively reasonable. Objectively reasonable. Right. And reasonable takes into account the totality of the circumstances in addition to their opinions. So you have not in anything that I've read challenged their expertise, challenged their experience, because if you did, then there would be reason to believe that their opinions were unreliable. Am I right? Well, on that score, yes. But we did challenge their opinions, not because we challenged their expertise, but because we thought their opinions were, A, irrelevant, and, B, not objectively reasonable, if you look at the totality of the circumstances that Your Honor has just mentioned. And that would include the fact that one of the officers, I believe it was Nelson, said that the boat might have been taking on water. Another thing we noted in their reply papers was that this was potentially hazardous. But doesn't that really support their conclusions? They have so much experience, they're not going to say it was taking on water. Otherwise, they would have acted much more, let's say, in a more serious way. They might have brought on other officers to assist them. They said it might be, which in conjunction with what they had is also in the record, is that this happens all the time. And you don't dispute that, right, because I heard that in the direct argument. No, we don't dispute that this might have happened to any boat in the harbor. We don't dispute that it happens all the time. They said in their declaration they routinely go into the harbor twice a day looking for situations such as this, make sure that they're adequately patrolling the harbor. But that's not the emergency exception. That's the point. The point is the emergency exception was depicted by the U.S. Supreme Court in Brigham City and Michigan v. Fisher as something far more drastic, even from the get-go, than what was presented in this particular case. And then we add Judge Wardlaw's concerns that once the boat was boarded, they weren't finding any water, that they continued the search even after it wasn't objectively reasonable to say that there might have been an emergency here. Aren't you, counsel, ignoring what is in the record as to why they moved to the bow of the boat? Because they couldn't find any water in the first area, in the first hatch they looked for. They couldn't find the answer. They had smoke. It was going around in circles. And it was tilted, I think, 15 degrees or whatever the terminology is. They couldn't find the answer. So why couldn't they move from one area to another area to determine what the problem was? Because there has to be an objective emergency for them to go from point A, point B, point C. Here it didn't exist, and the fact that the occupants of the boat that they talked to said we've got this under control, there's no problem. But they didn't. It was still going around in circles, and it was still sinking. Well, it never sank. It did sink, but it was sinking, wasn't it? I think it was tilting. I don't think the boat never sunk any more than it was from the initial observation. Thank goodness. That's right, because it had people on it, and innocent people as well. But the point is, is that the emergency exception that the Supreme Court contemplated in those cases where you had blood flowing, weapons, people screaming, 9-11 calls? You had all those kinds of things. How does Diemer support you? That's their strongest case, isn't it? Well, it supports us because on the objective reasonableness standard that I think we just heard a quotation from, I think that that's somewhat analogous to the situation that we're in here, that there is no objective reasonableness at a minimum in the continued search. We've never abandoned whether it was. . . I'm guessing unless, I mean, if they thought the boat was in danger of imminently sinking, then we wouldn't require them to go take the time to get a warrant. But if they concluded that the boat was just riding low and was it sinking, which they don't say, but I'm not saying it's fatal to the case. . . I'm still thinking through this case. Then they would have been able to get a warrant, but they still would have been able to search the boat with a warrant. That boat wasn't going. . . Where was the boat headed? Well, we don't know from the record where it was headed. I know where it was headed. We don't know from the record where it was headed. The point is that in response to your question and your colleague's question, it wasn't sinking, it was listing. Now, theoretically, it could have sunk a half hour or an hour later. We don't know. We never got that far. And the truth is now that we know that there were aliens on the boat that was causing it to list, we know that it never was going to sink, and it didn't sink. It was towed to dry dock. How do we know it was never going to sink? Well, I guess the response to that is that we never know that any boat isn't going to sink. The point is this one never took on enough water to sink and was towed into a dry dock after the arrest, and that the listing was because there were 10 or 15 people on that side of the boat, which was causing it to be sideways or leaning towards the front, for lack of a better term. All right. Well, we've gone way over on this. I'm sorry. That's all right. Thank you very much. An interesting argument by both sides. U.S. v. Jones and Carrillo Leal will be submitted, and we will take up the International Society for Christian Consciousness.
judges: Silver, Noonan, Wardlaw